## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

KIMBERLY ANN RIVES,

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

CASE NO. 1:20-cv-02549

DISTRICT JUDGE CHRISTOPHER A. BOYKO

MAGISTRATE JUDGE AMANDA M. KNAPP

**REPORT AND RECOMMENDATION**

Plaintiff Kimberly Ann Rives ("Plaintiff" or "Ms. Rives") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits. (ECF Doc. 1, ECF Doc. 13.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I.      Procedural History

Ms. Rives filed her application for Disability Insurance Benefits on March 21, 2018. (Tr. 15, 127, 162, 231-38.) She asserted a disability onset date of January 11, 2017. (Tr. 15, 231.) She alleged disability due to low vision, inability to stand or walk more than two hours, back and knee pain, and severe headaches. (Tr. 108, 129, 163, 168, 261.) Her application was denied at

1

the initial level (Tr. 163-65) and upon reconsideration (Tr. 168-74).  She then requested a

hearing.  (Tr. 176.)  A hearing was held before an Administrative Law Judge ("ALJ") on

December 10, 2019.  (Tr. 35-73.)

On February 5, 2020, the ALJ issued an unfavorable decision, finding Ms. Rives had not

been under a disability within the meaning of the Social Security Act from January 11, 2017

through the date of the decision.  (Tr. 12-34.)  In his decision, the ALJ noted that Ms. Rives had

prior denials for Title II benefits, with the most recent denial in March 2013 at the hearing level.

(Tr. 15; *see also* Tr. 114 (noting three prior disability claims filed in 2006, 2008, and 2011).)

Ms. Rives did not appeal the March 2013 decision and the ALJ found no reason to reopen her

prior application.  (*Id*.)  Noting that there had been a change in law regarding how the

Commissioner evaluated mental impairments as well as new evidence since the prior decision,

the ALJ concluded that he was not bound by the prior decision.  (Tr. 16.)  Ms. Rives requested

review of the ALJ's February 5, 2020 decision by the Appeals Council.  (Tr. 227-30.)  On

September 11, 2010, the Appeals Council denied Ms. Rives' request for review, making the

ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Rives was born in 1964.  (Tr. 27, 42.)  She was 52 years old on the alleged disability

onset date, and 55 years old as of the December 10, 2019 hearing.  (*Id*.)  She lived with her

boyfriend and her adult daughter, who was a person with Down syndrome and other medical

conditions.  (Tr. 43, 44.)  Ms. Rives previously worked as a STNA in hospital and nursing home

settings.  (Tr. 59-63.)  She reported being terminated from one job because of interactions with a

coworker, explaining that the employer said she "made a hostile work environment," but arguing

that she was in "defensive mode" because the coworker "kept picking at me that day."  (Tr. 61-
62.)  She reported being terminated from another job after reporting the employer's failure to
take action regarding a dangerous patient. (Tr. 62-63.)  At the time of the hearing, she testified
that she was working three days per week as a home health aide for a wheelchair user, with job
duties that included vacuuming, washing dishes, and providing companionship.  (Tr. 58-59.)

## B.    Medical Evidence

### 1.    Treatment History

On January 11, 2017, Ms. Rives was physically assaulted by a patient while working as a
STNA at a hospital.  (Tr. 373, 399.)  She presented to the emergency room at MetroHealth the
day after the incident, complaining of right-sided head pain, blurred vision, dizziness, and lower
back pain.  (Tr. 399-401.)  She reported she was pushed into a door frame by a patient, hitting
the right posterior side of her body; she reported no loss of consciousness, but was dazed and had
a headache for about an hour.  (Tr. 399.)  She told providers that the headache persisted, causing
her problems sleeping, and that she took Advil PM with minimal relief.  (*Id*.)  She was evaluated
by attending physician Craig Bates, M.D., who noted that she ambulated with a steady gait,
demonstrated full strength in the upper and lower extremities, and had full range of motion in all
extremities, normal peripheral perfusion and pulses, no edema, normal cerebellar finger to nose,
normal neuro exam, and normal affect.  (Tr. 400-01.)  Dr. Bates found that she was well
appearing, with no neurological deficits to suggest an underlying intracranial deficit.  (Tr. 401.)
He assessed her with paraspinal musculoskeletal pain in the lumbar and thoracic regions,
recommending symptomatic treatment for pain and a follow up in the concussion clinic.  (*Id*.)

On January 13, 2017, Ms. Rives initiated care with Daniel Malkamaki, M.D. in the
Department of Physical Medicine and Rehabilitation PM&R Clinic for right head contusion,

3

neck sprain, right elbow contusion, and low back sprain with radiation to the right lower extremity.  (Tr. 397.)  She complained of pain localized in the cervical, lumbar, and right elbow region, describing her pain as sharp and intense with radiation to her right calf, but with no weakness or sensory changes.  (*Id*.)  She reported that her pain was constant but varied in intensity, explaining that her pain increased with walking and was relieved with medication, rest, and changing positions.  (*Id*.)  Her examination revealed maximal tenderness over the right side of the head, with cervical range of motion limited with rotation to only 25% of full, lateral bending the same, flexion close to normal, and no extension, with most pain with extension and rotation to the right as it "would cause dizziness."  (Tr. 398.)  She had normal pedal pulses, with maximal tenderness to palpation over the low back diffusely, with moderate paraspinal hypertonicity, and limited lumbosacral range of motion.  (*Id.*)   She demonstrated normal strength and sensation in the lower and upper extremities, and a stable gait, but Dr. Malkamaki observed "a ton of pain inhibited movements here that made the whole exam very difficult, and the mother was present, encouraging the sick roll," so that Dr. Malkamaki "gave max effort to urge [Ms. Rives] to normalize the situation."  (*Id*.)  Dr. Malkamaki recommended R.I.C.E. (rest, ice, compression, and elevation) and NSAIDs, and noted that she would also follow up with a concussion specialist.  (Tr. 399.)  He also recommended that she try Voltaren for a few weeks to help her get into a routine of a home exercise program to prevent stiffness.  (*Id*.)

On January 17, 2017, Ms. Rives presented to James Begley, M.D. in the PM&R Concussion Clinic at MetroHealth for a mild traumatic brain injury evaluation.  (Tr. 393.)  Dr. Bagley noted that she reported high concussion symptomatology based on her SCAT (Sport Concussion Assessment Tool) test scores, but also reported that her symptoms had slowly been getting better.  (Tr. 394.)  Examination findings included intact cervical range of motion, no

edema or deformity in the extremities, normal motor strength and sensation in all limbs, normal reflexes, and a wide-based antalgic gait. (Tr. 395-96.) She scored 4/5 on orientation testing, 15/15 on immediate memory testing, 3/5 on concentration testing, and 3/5 on delayed recall testing. (Tr. 396.) Dr. Begley was unable to conduct balance testing due to her musculoskeletal pain. (*Id*.) He diagnosed a concussion without loss of consciousness, and recommended that Ms. Rives continue to use Voltaren and Robaxin sparingly, rest, use sunglasses and earplugs as needed for sensitivity to light and noise, and follow up in two weeks. (*Id*.) Dr. Begley noted that her symptoms were too acute to allow for return to work at that time. (*Id*.)

Ms. Rives continued to follow up with Dr. Begley in the concussion clinic through February 2017. (Tr. 380-382, 388-390.) At her February 27, 2017 appointment, she reported overall improvement in her musculoskeletal and concussion symptoms, that her headaches were controlled with Tylenol or ibuprofen, and that her recall and attention were improved. (Tr. 380.) She had not tried using Topamax or amantadine. (*Id*.) She continued to report sensitivity to loud noises and lights, but said those symptoms were improved and that she was interested in returning to work soon. (*Id*.) She also reported she was no longer taking Flexeril or Robaxin for her low back pain. (*Id*.) Dr. Begley did not feel she needed speech or physical therapy due to her improvement, and concurred with a planned March 9, 2017 return to work date. (Tr. 382.) Ms. Rives called Dr. Begley's office on March 16, 2017, reporting that her head hurt and was spinning, so she could not focus. (Tr. 377.) She was again advised to try Topamax. (*Id*.)

Ms. Rives also continued to follow up with Dr. Malkamaki for her head contusion, neck sprain, elbow contusion, and low back sprain through March 2017. (Tr. 377-379, 382-387, 391-393.) At those visits, Dr. Malkamaki reminded her about the importance of maintaining a consistent home exercise program. (Tr. 378, 383, 384, 385, 391.) At her March 7, 2017

appointment, Dr. Malkamaki opined that she was "probably 80% better with the low back and knee, and 80% with the neck." (Tr. 379.) He continued to recommend at home exercises to prevent stiffness, and recommended that she continue using Voltaren, NSAIDs, and Robaxin. (*Id.*) He also re-recommended the Topamax Dr. Begley recommended for headaches. (*Id.*) It was noted that she would return to work at full duty on March 13, 2017. (*Id.*)

On April 6, 2017, Ms. Rives saw Lisa Lincoln, CCC-SLP, at MetroHealth for a speech-language pathology initial evaluation for mild cognitive-communicative deficit. (Tr. 374.) Ms. Rives reported heaviness in her head but without pain, as well as difficulty maintaining her train of thought and getting words out. (*Id.*) She reported that she had returned to work full-time ten days earlier, "or else I'd lose my job," and said she was managing at work without significant difficulties but had some changes with her memory. (*Id.*) Ms. Rives presented with mild cognitive-communicative deficits characterized by reported short-term memory difficulties. (Tr. 376.) SLP Lincoln found that Ms. Rives' ability to recall newly presented information was within normal range but below average, she had a tendency to confabulate information to fill in missing information, and her ability to retain information following a delay was within normal range. (*Id.*) SLP Lincoln opined that these noted difficulties suggested possible difficulties with information processing. (*Id.*) She also observed that: Ms. Rives' discourse was occasionally verbose; her attention, although not formally assessed, appeared adequate; her ability to plan/organize was poor; her auditory and reading comprehension were adequate at the sentence and paragraph level; she was impulsive during the assessment; and her speech, hearing, and swallowing appeared normal. (*Id.*) She recommended that Ms. Rives participate in speech therapy sessions one to two times per week. (*Id.*)

6

Ms. Rives followed up with Dr. Begley in the concussion clinic on April 10, 2017, reporting she was doing well back at work, but continued to have headaches.  (Tr. 370.)  She said she was not interested in trying a new medication, and reported that 600 mg of ibuprofen was usually effective to treat her headaches.  (*Id*.)  She reported attending speech therapy.  (*Id*.)  On examination, her motor strength and sensation were intact, and her gait was normal.  (*Id*.)  Dr. Begley diagnosed her with concussion with interval improvement, and recommended that she continue taking ibuprofen 600 mg two-to-three times daily and continue speech therapy.  (*Id*.)

She returned to Dr. Begley for follow up on June 12, 2017, reporting that ibuprofen was controlling her headaches and that she was not interested in new medications.  (Tr. 362.)  She also reported that she missed work to attend speech therapy and was terminated from work for not following their attendance policy.  (*Id*.) She said she was not upset about the termination because she had benefits from her long-term employment at the hospital.  (*Id*.)  She planned to take the summer off and believed she would have new job opportunities.  (*Id*.)  Examination findings were normal.  (Tr. 362-363.)  She was diagnosed with concussion with continued improvement and her ibuprofen was renewed.  (Tr. 363)

Ms. Rives attended eight sessions of speech therapy, and was discharged on June 20, 2017.  (Tr. 360-61, 363-69.)  At the final session, SLP Lincoln noted that Ms. Rives' attendance had been inconsistent, but that she had made slow but steady progress in areas related to memory, problem solving, and restating tasks.  (Tr. 360.)  SLP Lincoln noted that Ms. Rives had met or partially met her treatment goals, and encouraged Ms. Rives to return if she encountered functional difficulties in the workplace.  (Tr. 361.)

Ms. Rives returned to Dr. Begley for a concussion follow up on September 18, 2017.  (Tr. 358-60.)  She reported feeling better overall, that her headaches were much better and

7

controlled with ibuprofen, but that she had run out of ibuprofen.  (Tr. 358.)  She reported less

pain, but continued "pressure and 'a presence' of the headache."  (*Id*.)  She said her headaches

generally occurred when waking up or going to sleep, and that she sometimes took Melatonin to

help her sleep.  (*Id*.)  She reported that she was not working but was planning on starting a new

job as a home care provider in November.  (*Id*.)  She had a bright affect and her examination

findings were normal.  (Tr. 359-60.)  Her diagnosis remained the same.  (Tr. 360.)  Dr. Begley

renewed the ibuprofen prescription and recommended that she follow up in four months for a

renal function evaluation due to long-term NSAID use.  (*Id*.)

Ms. Rives attended another concussion follow up with Dr. Begley on January 22, 2018,

reporting that she was doing as well as she was at her last visit, and was generally satisfied with

her current status.  (Tr. 356-57.)  She was still taking ibuprofen 800 mg once or twice most days

for her headaches and her back pain.  (Tr. 357.)  She was working home care and preferred it

over working in a hospital setting.  (*Id*.)  She had a bright affect and her physical examination

findings remained normal.  (Tr. 357-58.)  Her diagnosis was the same.  (Tr. 358.)  Dr. Begley

renewed her ibuprofen, ordered renal function testing, and recommended that she follow up in

six months.  (*Id*.)

Ms. Rives was assaulted on May 31, 2018 with a baseball bat, resulting in displaced

fractures of her left radial and ulnar shaft.  (Tr. 697.)  She underwent an open reduction and

internal fixation of the left radial and ulnar shaft fracture on June 6, 2018 at University Hospitals.

(Tr. 441-42, 697.)

On September 24, 2018, Ms. Rives saw John Samsa, D.O. at LakeHealth NE Ohio Heart

Associates for a cardiac evaluation due to reported episodes of palpitations and chest pressure

occurring over the prior few months.  (Tr. 682.)  Examination findings were normal.  (Tr. 682-

83.)  Dr. Samsa ordered an EKG and a Holter Monitor.  (Tr. 683.)  Testing conducted on October 23, 2018 showed no concerning EKG changes and no arrhythmias.  (Tr. 686-87.)  The Holter Monitor showed a basic rhythm and normal sinus rhythm and a rare PAC (premature atrial contractions) and rare PVC (premature ventricular contractions).  (Tr. 688.)  The undersigned is unaware of any records documenting further follow up for palpitations.

On October 8, 2018, Ms. Rives returned for follow up with Dr. Begley at the concussion clinic, reporting that she was feeling much worse.  (Tr. 697-99.)  She denied head trauma associated with the May 2018 assault, but noted an increase in headaches over the prior months. (Tr. 697.)  She also reported "jaw clicking" that she thought might be secondary to muscle tension and stress.  (*Id*.)  She continued to report sensitivity to noise but denied light sensitivity. (*Id*.)  She reported being more irritable, severely depressed, and sad, but denied suicidal ideation. (*Id*.)  She stated that she had positions with Medicaid and Humana Senior Ridge, but was not securing many jobs because of a wrist restriction.  (Tr. 697.)  She said the only thing that helped her pain was Tramadol and Percocet that she "borrowed" from her mother.  (*Id.*)  She reported that she was also taking Motrin 800 mg and Aleve.  (*Id*.)  Dr. Begley advised Ms. Rives that taking double NSAIDs was dangerous, and that she should stop.  (Tr. 697, 698.)  On examination, her affect was depressed, but physical examination findings were normal.  (Tr. 698.)  She was diagnosed with concussion and depression.  (*Id*.)  Dr. Begley prescribed Celexa and Lyrica.  (*Id*.)  He also recommended that she see psychology, but Ms. Rives declined.  (*Id*.)

On January 14, 2019, Ms. Rives had a lumbar MRI at University Hospitals due to indications of degenerative joint disease.  (Tr. 714-15.)  The MRI noted degenerated discs with endplate changes at L5-S1, moderate facet joint arthropathy on the left side, mild facet joint

arthropathy on the right side, moderate encroachment of the left neural foramina, and mild encroachment of the right neural foramina.  (*Id*.)

Ms. Rives appears to have consulted with Louis DeMicco, D.O. in connection with her worker's compensation claim, receiving diagnoses of concussion and lumbar sprain.  (Tr. 758, 763.)  During a January 30, 2019 visit with Dr. DeMicco, she stated that her neurology consult, lumbar MRI, and physical therapy had been denied by BWC at a hearing, but she was able to obtain an MRI through her private insurance.  (Tr. 763.)  Dr. DeMicco indicated he would try to obtain the results of the MRI.  (*Id*.)  Ms. Rives reported that she continued to have memory issues and headaches.  (*Id*.)  On examination, she was alert and oriented, her heart was regular without murmurs, her reflexes were equal in the lower extremities, she had some tenderness over the lumbar muscles and SI joints, and she had reduced range of motion with flexion and extension.  (*Id*.)  Dr. DeMicco indicated he felt that Ms. Rives had post-concussive syndrome and Ms. Rives planned to try to see a neurologist through her private insurance.  (*Id*.)  She also reported that she planned to continue working.  (*Id*.)

Ms. Rives saw Dr. DeMicco again on February 27, 2019.  (Tr. 762.)  She reported having intermittent headaches, memory and concentration problems, low back pain, and pain in her left buttock into her left leg.  (*Id*.)  On examination, she was alert and oriented, her heart was regular without murmurs, her muscle strength was equal in her upper and lower extremities, there were no focal deficits, she had some tenderness over the lumbar muscles and SI joints, she had reduced range of motion with flexion and extension, and her reflexes were one out of four in her lower extremities.  (*Id*.)  Ms. Rives reported that she planned to work, that she understood the benefits of a home stretching program for her back, and that she planned to try to obtain her MRI results since Dr. DeMicco had been unable to get the results.  (*Id*.)

10

When Ms. Rives saw Dr. DeMicco on March 21, 2019, she complained of low back and left leg pain that was so intense that she had not been working for the past three weeks. (Tr. 761.) She reported taking ibuprofen, but said it was not really helping. (*Id.*) On examination, Dr. DeMicco observed that Ms. Rives had some difficulty getting in and out of her chair. (*Id.*) She had pain over the lower lumbar spine that was worse over the left SI joint. (*Id.*) She also had some spasm, reduced range of motion with flexion and extension, pain with left sided straight leg raise test at 40 degrees with hip flexion, and decreased reflexes in the lower extremities. (*Id.*) Dr. DeMicco had obtained the lumbar MRI results, and noted that it showed degenerative disc disease at L5-S1. (*Id.*) He advised Ms. Rives on the benefits of ice and heat, and provided a prescription for Naproxen to try in place of ibuprofen. (*Id.*) He also noted that he was going to submit paperwork for an EMG for the reported left leg pain. (*Id.*)

On April 4, 2019, Ms. Rives saw pain management specialists, Joshua Pastor, M.D., and Al-Amin Khalil, M.D., at University Hospitals for complaints of left hip, buttock, and leg pain. (Tr. 814-20.) She relayed that she felt like "superwoman" prior to her injury at work two years earlier, but now could hardly walk. (Tr. 816.) She reported that the pain in her left hip and leg was pretty much constant and she had a hard time with her activities of daily living. (*Id.*) She said she could not walk for more than two hours or stand for extended periods, and that she had to lean on a shopping cart. (*Id.*) She reported taking 2400 mg of ibuprofen daily, 500 mg of acetaminophen twice daily, and 5 mg of oxycodone (given to her by her sister) every other day. (*Id.*) She also reported taking hot baths and using hemp oil cream. (*Id.*) She reported that nothing really helped, other than laying still for a long period of time. (*Id.*) She indicated she had not tried physical therapy. (*Id.*) She had received a cortisone injection in her knee, but said it did not help, and that she could not get out of bed for three days following the injection. (*Id.*)

11

On examination, she was in no acute distress, her reflexes were normal, and she had normal range of motion in her head/neck.  (Tr. 818-19.)  However, her gait was abnormal due to left hip pain, there was severe tenderness to palpation in the left hip with increasing pain associated with passive range of motion of the left hip, and her motor strength was 3/5 in the left lower extremity compared to the right due to pain.  (Tr. 819.)  She was diagnosed with left hip bursitis, bilateral sacroiliitis, and left knee osteoarthritis.  (Tr. 820.)  She received a bursa injection in her left hip and was referred for physical therapy.  (*Id*.)  The undersigned is unaware of any evidence indicating whether she followed up on the physical therapy referral.

On April 11, 2019, Ms. Rives saw M.P. Patel, M.D. with a request for a change of physician of record in connection with her worker's compensation claim.  (Tr. 737-38.)  She reported that her headaches continued to bother her, describing them as throbbing and encircling her entire head.  (Tr. 737.)  She reported that dizzy spells occurred along with her headaches, which caused fatigue.  (*Id*.)  She also complained of recurring sharp pain in her lumbar spine extending into her legs.  (*Id*.)  She explained that her back symptoms were more affected by activities such as bending, lifting, and prolonged sitting, and were worse in the morning.  (*Id*.)  On examination, Dr. Patel observed that Ms. Rives appeared to be in pain and had difficulty trying to kneel-squat and heel-toe walk.  (Tr. 737-38.)  He observed no edema, and found pulses were good in the extremities.  (Tr. 737.)  She exhibited tenderness along the frontal and temporal areas of her head, but cranial nerves II-XII were normal.  (Tr. 738.)  Her examination also revealed a mildly positive Tandem Rhomberg Sign, muscle spasm over the paraspinal muscles extending from L1-S1, restricted range of motion in the lumbosacral spine, low back pain and radiating leg pain at 25 degrees with straight leg raise testing, and Patellar and Achilles reflexes of 1 + in the lower extremities.  (*Id*.)  Ms. Rives reported that she had been unable to work since

12

March 15, 2019, but was planning to return to work the next week.  (*Id*.)  Dr. Patel recommended Mobic, Neurontin, and Baclofen, and referred her to physical therapy.  (*Id*.)  The undersigned is again unaware of evidence as to whether she followed up on the physical therapy referral.

Ms. Rives saw Dr. Patel four times in May 2019.  (Tr. 729-30, 731-32, 733-34, 735-36.)  At those visits, she continued to complain of headaches and back / leg pain.  (Tr. 729, 731, 733, 735.)  She also complained of paresthesia, leg weakness, problems with certain activities such as with walking, standing, climbing or descending stairs, and falling episodes.  (*Id*.)  Examination findings were generally unchanged from her April 2019 visit.  (Tr. 729, 731, 733, 735, 738.)  Dr. Patel made some adjustments to Ms. Rives' medications and recommended an orthopedic consult and EMG/NCV.  (Tr. 730, 732, 734.)

There are partial or incomplete records from a May 8, 2019 visit that Ms. Rives had with Lashara Colvin, APRN-CNP, in the behavioral medicine and counseling department at MetroHealth.  (Tr. 772-76.)  The records in evidence indicate that Ms. Rives' diagnosis was post-traumatic stress disorder, and she was directed to continue taking Cymbalta and Ativan. (Tr. 772-73.)  Ms. Rives returned to see CNP Colvin on June 5, 2019.  (Tr. 777-84.)  She reported having stopped taking Cymbalta about a week after her last appointment because it gave her a "crawling sensation."  (Tr. 778.)  She also reported that she thought she got a job as a cashier, which she hoped might help lift her spirits.  (*Id.*)  She noted that her attorney advised her not to work, but said her claim had been going on for three years and that she was depressed about not working.  (*Id.*)  She said she could handle the depression before, but could not anymore, and "just lay in the bed in a dark room."  (*Id.*)  She also complained of being aggravated with her mother, and having increased thoughts of suicide, but without plan or intent. (*Id.*)  On examination, she was well-groomed, cooperative, oriented, and talkative, her thought

13

process was logical and organized, there was no evidence or paranoia, delusions, or perceptual disturbances, her mood was depressed, she a full affect, her attention and concentration were sustained, she had poor recent memory, and her judgment and insight were fair.  (*Id*.)  CNP Colvin noted that Ms. Rives was ambivalent about medication management, reporting that a lack of emotional support was her biggest concern.  (Tr. 779.)  CNP Colvin prescribed Effexor to target Ms. Rives' symptoms of depression and instructed her to continue taking Ativan.  (*Id*.)  CNP Colvin also recommended that Ms. Rives schedule for psychotherapy.  (*Id*.)  It appears Ms. Rives scheduled another appointment with CNP Colvin, but did not schedule counseling.  (*Id*.)

On June 14, 2019, Ms. Rives saw Dr. Begley at the concussion clinic, complaining of right-sided headaches similar to those she was having when she last saw Dr. Begley in October 2018.  (Tr. 785.)  She also reported occasional soreness of the right TMJ.  (*Id*.)  She relayed that she had stopped taking the Lyrica prescribed in October because of side effects, and had stopped taking the gabapentin prescribed by another provider because she felt it was ineffective.  (*Id*.)  She reported that she was not interested in trying other medications, but was interested in another MRI and an injection.  (*Id*.)  She also reported light sensitivity and some irritability and anger, but had refused rehabilitation psychology in the past and was still not interested in pursuing it.  (Tr. 786.)  On examination, her affect was depressed but her physical examination findings were normal.  (Tr. 787.)  She was diagnosed with post-concussion syndrome and chronic daily headaches.  (*Id*.)  Dr. Begley submitted a neurology consult, recommended rehabilitation psychology, and advised Ms. Rives to follow up with Dr. Malkamaki as scheduled and return to the concussion clinic two to three weeks after her neurology appointment.  (Tr. 787-88.)

As part of her worker's compensation claim, Ms. Rives attended an Independent Medical Examination ("IME") conducted by W. Kent Soderstrum, M.D., ABIM, ABPM-OM on July 24,

14

2019.  (Tr. 746-57.)  On examination, Dr. Soderstrum noted that Ms. Rives sat, stood from a

seated position, and got onto the exam table without apparent difficulty.  (Tr. 754.)  She

ambulated without apparent gait derangement and without an assistive device.  (*Id.*)  She was

alert and oriented, and answered all questions appropriately and without articulation difficulties.

(*Id.*)  Her neurological examination findings were normal, except that a Romberg test was

equivocal for minimal loss of balance and she was able to heel-to-toe walk with mild apparent

balance difficulty.  (*Id.*)  Her spinal examination was also normal, except for observed

hyperlordosis of obesity, reported tenderness at L4-L5, some reported pain with range of motion,

and positive facet loading bilaterally.  (Tr. 754-755.)

Ms. Rives returned to see Dr. Patel on July 29, 2019.  (Tr. 725.)  She reported mild

recurring headaches, low back pain that was migrating in nature, morning stiffness for several

hours, increased pain with bending, lifting, and climbing or descending stairs, and relief with

medication and stretching.  (*Id*.)  On examination, she exhibited mild tenderness in the frontal

and temporal areas, mildly positive Tandem Rhomberg Sign, lumbosacral spine tenderness,

paraspinal muscle spasm, mild restriction in range of motion with flexion and extension, positive

straight leg raise bilaterally at 65 degrees, 1 + deep tendon reflexes in bilateral lower extremities,

and no abnormality in the cranial nerves II-XII.  (*Id*.)  Dr. Patel's diagnoses were concussion

without loss of consciousness and sprain of ligaments of lumbar spine.  (*Id*.)  He continued her

Baclofen and Mobic prescriptions, and advised that she could add over-the-counter medications

as needed.  (Tr. 726.)  He also recommended stretching and strengthening exercises.  (*Id*.)

On August 14, 2019, Ms. Rives saw Rodica Di Lorenzo, M.D., Ph.D. in the Department

of Neurology at MetroHealth Medical Center for an evaluation and management of her

headaches.  (Tr. 792-99.)  She reported that she woke up with a headache every day with pain

that was "like [a] knife scraping inside her head."  (Tr. 793.)  She reported that her headaches

went away for six-to-eight hours after taking pain pills, but they returned later in the day.  (*Id*.)

She reported that alleviating factors included: a hot towel on her head, hot baths, 2400 mg of

Motrin daily, 600 mg of Tylenol daily, occasional Oxycodone (provided to her by her mother),

and two Excedrin at night.  (*Id*.)  She reported being disoriented at times, losing her train of

thought, occasional difficulties getting her words out, and being very mean.  (*Id*.)  She also

reported falling occasionally when going down steps "as she feels lightheaded or her knees give

out."  (*Id*.)  Dr. Di Lorenzo noted: "Overall, the patient puts a lot of emphasis on her persistent

headaches and symptoms.  She does not appear to be in any physical distress."  (*Id*.)  Physical

examination findings were normal, including normal neck and musculoskeletal range of motion,

no musculoskeletal tenderness or deformity, and normal mood, affect, behavior, and thought

content.  (Tr. 795.)  Ms. Rives' neurological and motor examinations were normal, and her

reflexes, sensation, coordination, and gait were normal.  (*Id*.)  Dr. Di Lorenzo diagnosed Ms.

Rives with intractable chronic post-traumatic headache and medication overuse headache, noting

that Ms. Rives "appears to have a complex headache syndrome, partially caused by her

concussion, and partially by her chronic OTC analgesic use."  (Tr. 796.)  He explained that his

facility did not have the appropriate resources to treat her condition and placed a referral to the

Cleveland Clinic Headache Center.  (*Id*.)

   During the month of October 2019, Ms. Rives received chiropractic treatment from

providers at All Health Chiropractic and Rehabilitation Centers, Inc. for reported pain in her low

back and hips.  (Tr. 702-11.)  Objective findings included restricted lumbar spine range of

motion and hypertonicity of the lumbar spine muscles with trigger points noted.  (Tr. 705, 709,

711.)  Ms. Rives reported less pain and discomfort during her last session in October 2019, and reported that she was taking over-the-counter medication to help decrease her pain.  (Tr. 711.)

On October 8, 2019, Ms. Rives saw Stacy Caldwell, Ph.D. at MetroHealth for a behavioral health counseling and therapy session.  (Tr. 800-06.)  Ms. Rives reported having a strained relationship with her mother, not being able to get out of bed some days to go to work, feeling that a lot of people depended on her, but also feeling hopelessness that she was not needed or able to make a difference, and a history of ten suicide attempts.  (Tr. 800.)  She shifted between crying and euthymic during the session, stating that she planned to be around for Halloween and her birthday, but she was not sure about Christmas.  (*Id*.)  She reported that she had stopped taking Effexor but was still taking Ativan at night.  (*Id*.)  On mental status examination, Ms. Rives appeared well groomed, she was calm at times and crying and labile at times, she was oriented,  her speech was spontaneous with a normal rate and flow, her thought process was logical and organized, her associations were tight, she expressed paranoid ideation and suicidal ideation, her judgement and insight were good, her memory was within normal limits, her attention and concentration were sustained, her language was appropriate, her fund of knowledge was okay, her mood was euthymic and depressed, and she had a full affect.  (Tr. 801.)  Dr. Caldwell developed a safety plan and recommended a follow-up counseling appointment.  (Tr. 802, 803.)  Dr. Caldwell followed up with Ms. Rives' boyfriend on October 17, 2019, regarding the safety plan put in place to address Ms. Rives' suicidal ideation, and he reported that her mood seemed better, and she had been writing in her journal.  (Tr. 803.)  No further counseling records appear in the record.

On October 29, 2019, Ms. Rives saw ophthalmologist Sheldon Oberfield, M.D. at the Cleveland Clinic for reported vision problems.  (Tr. 766.)  She explained that she had noticed

floaters in her right eye since her injury in 2017, and that they had been bothering her more recently and interfered with her driving.  (*Id.*)  She was diagnosed with posterior vitreous detachment and vitreous floaters of the right eye, and was prescribed eye drops.  (Tr. 769-70.)

Ms. Rives returned to Dr. Begley in the concussion clinic on November 25, 2019.  (Tr. 807-12.) She reported seeing an ophthalmologist who identified a problem with her eye.  (Tr. 808.)  She also reported seeing a headache specialist at the Cleveland Clinic who provided her with some medication recommendations, but said she was not interested in trying them.  (*Id.*) She described her headaches as constant on the right-side of her head down into her jaw, with sensitivity to light.  (Tr. 808.)  Overall, she reported that she felt things were the same, and said she was aggravated and did not want to have to come in.  (*Id.*)  She said she only came in to keep her case open for BWC.  (*Id.*)   On examination, her affect was appropriate but a little argumentative and sarcastic at times.  (Tr. 809.)  Physical examination findings, including gait, strength, and sensation, were normal.  (*Id.*)  Dr. Begley recommended that Ms. Rives continue taking Motrin for her headaches, and advised her that she could follow up again with the headache specialist at the Cleveland Clinic if she wanted more headache management.  (*Id.*)

2.      **Opinion Evidence**

i.      **Consultative Examiners**

a.      **Physical Consultative Examination**

On April 25, 2018, Dorothy Bradford, M.D. conducted a consultative physical evaluation.  (Tr. 420-27.)  Ms. Rives described the January 11, 2017 work injury and reported that she was forgetful at times, sometimes could not get her speech out, saw flashing lights in her right eye, had headaches, had personality changes, had right knee and low back pain, and could only stand/walk for two hours.  (Tr. 425.)  Dr. Bradford ordered x-rays of Ms. Rives' right knee

18

and lumbar spine.  (Tr. 352.)  The knee x-ray showed mild osteoarthritis and no effusion or fracture, and the lumbar spine x-ray showed lumbosacral arthritis with no fracture or significant spondylolisthesis.  (*Id*.)  Dr. Bradford observed Ms. Rives to be alert and oriented, with normal speech and language, and normal physical examination findings, with the exception of bilateral mild genu varum.  (Tr. 427.)  He opined that Ms. Rives had no activity restrictions, and noted that it was possible Mrs. Rives' "alleged neurological symptoms [were] due to CNS effects of untreated hypertension."  (*Id*.)

### b.    Psychological Consultative Examination

On April 24, 2018, Natalie M. Whitlow, Ph.D. conducted a consultative psychological evaluation.  (Tr. 409-19.)  Ms. Rives attended the evaluation alone.  (Tr. 410.)  When asked why she was applying for social security disability benefits, Ms. Rives said she was diagnosed with PTSD, manic depression, suicidal ideation, and homicidal ideation in 2003, although she noted that she would not hurt anyone.  (*Id*.)  She indicated that she was able to perform the physical aspects of her job, but she could not handle things mentally.  (*Id*.)  Between 2003 and her work accident in 2017, she reported that she would get sent home from work for crying, that her mind would wander, that she would be so down that she would stay in bed all day, or that her mind would race.  (*Id*.)  Since her concussion in 2017, she reported she could not focus, lost her train of thought, and had migraine headaches.  (*Id*.)  She also reported that more recently she had blinking in her right eye and was seeing spots.  (*Id*.)  Dr. Whitlow noted that she was unable to explain how her thought processing issues got worse since her concussion because "she continually jumped from discussing her physical impacts to her responsibilities for taking care of her daughter to her lack of will to live."  (*Id.*)

She reported having a "horrible" childhood and dropping out of school in eighth grade. (Tr. 411.)  She explained that she was working part-time as a home health aide, and also cared for a daughter who was diagnosed with schizophrenia and Down syndrome.  (Tr. 411-412.)  She reported unhealthy sleeping and eating patterns, and also reported having no friends, social support system, or meaningful social or extracurricular activities, saying that "people look at [her] and think [she's] crazy and don't want to deal with [her]."  (Tr. 413.)

She reported that she was not taking psychotropic medications, but indicated she had taken them in the past for symptoms related to depression, mood instability, disturbed sleep patterns, nightmare cessation, racing thoughts, and auditory hallucinations.  (Tr. 411.)  She reported the medications were not effective and caused her to be in a "sleepy state."  (*Id.*)  She also denied being involved in any behavioral health treatment, saying she had been treated by many different doctors and they could not help her.  (Tr. 412.)  She did report at least nine hospitalizations due to suicide attempts, most recently in 2006.  (Tr. 413.)  She also reported a history of alcohol abuse, most severe between 2000 and 2007, and said she discontinued problematic behaviors in 2007 but continued to drink socially and recreationally.  (Tr. 412.)

On examination, Dr. Whitlow observed that she was dressed in culturally appropriate clothing that appeared to be fairly clean and moderately kept.  (Tr. 413.)  Her hygiene was attended to and she maintained appropriate eye contact.  (*Id.*)  She arrived on time for her appointment and appeared to be alert and attentive and coherent with her communication.  (*Id.*)  However, she arrived in a frantic state, screaming "Hello" when she entered the waiting room and ignoring a "Do Not Disturb" sign to enter Dr. Whitlow's office unannounced.  (*Id.*)  She then started rambling about not knowing where she was, and said she was randomly trying other

doors in the office building. (Tr. 413-14.) She then indicated "I'm not like this; since my accident, I haven't been sharp, like I used to be." (Tr. 414.)

Dr. Whitlow observed that Ms. Rives' speech and thought processing appeared to be outside a normal range of functioning during the evaluation, and was problematic. (Tr. 414.) Dr. Whitlow explained that: Ms. Rives' thought processing appeared to be racing, tangential, erratic, and off tasks; her communication pattern was excessive, tangential, erratic, emotion-driven, unstable and often off-task; and she often engaged in exhaustive storytelling that was not relevant to the evaluation and triggered her emotional trauma. (*Id.*) Her affect during the evaluation was described as labile, fragile, erratic, often unsolicited and inappropriate, and problematic. (*Id.*) However, she did not present as anxious during the evaluation and did not report having anxiety symptoms. (*Id.*) She appeared to possess average cognitive functioning and fair insight, but poor judgment. (Tr. 414-15.) She was assessed with poor judgment "because she reported (and presented as) engaging in behaviors, thought processing, and decision-making that [were] motivated and driven by mental health symptomology." (Tr. 415.)

Dr. Whitlow observed that Ms. Rives presented with significant signs of bipolar disorder, including: excessive crying; labile, fragile, and erratic affect; erratic and frantic presentation; scattered thought processes; rambling, excessive, and off-task communication; inability to stay on task and follow the structure of the evaluation; and sudden displays of unsolicited and extreme emotions. (Tr. 412-13.)

Ms. Rives was diagnosed with bipolar I disorder, severe, most recent episode depressed, rapid cycling. (Tr. 415.) Although Ms. Rives reported a prior diagnosis of PTSD, Dr. Whitlow found insufficient evidence to support that diagnosis. (*Id.*) In her summary and conclusions, Dr. Whitlow stated in part:

21

Based off all of the evidence presenting during this evaluation, it is the current evaluator's professional opinion that the claimant's mental health symptoms cause her to have impairments with engaging in the many aspect[s] of the work world related to maintaining emotional stability, not engaging and presenting herself []in erratic ways, controlling her wandering and racing thoughts, staying on task and completing tasks engaging in clear and organized thought processing, and  being able to follow through on directives in order to have optimal performance and production.

(Tr. 417.)  With respect to Ms. Rives' functional abilities, Dr. Whitlow opined that Ms. Rives:

- did not appear to have limitations with understanding instructions;

- appeared to have limitations with remembering and carrying out instructions;

- appeared to have limitations in maintaining attention and concentration and in maintaining persistence and pace to perform simple and multi-step tasks;

- did not appear to have limitations in responding appropriately to supervision and coworkers in a work setting; and

- appeared to have limitations in responding appropriately to work pressures in a work setting.

(Tr. 417-18.)

## ii.     State Agency Reviewing Consultants

### a.     State Agency Medical Consultants

On November 17, 2018, state agency medical consultant Leanne M. Bertani, M.D. concluded that Ms. Rives did not have a severe physical impairment.  (Tr. 120-21.)   On March 6, 2019, state agency medical consultant Mehr Siddiqui, M.D., completed a physical RFC assessment on reconsideration, also finding no severe physical impairment.  (Tr. 138-39.)

22

### b. State Agency Psychological Consultants

On November 16, 2018, state agency psychological consultant Vicki Warren, Ph.D. noted that she would disregard (1) the findings of the April 24, 2018 psychological consultative examination and (2) information provided by Ms. Rives during a clarifying call on April 9, 2018 based on a CDIU fraud investigation finding of "similar fault," as discussed more fully in Section III.C., *infra*, in accordance with the Social Security Act. (Tr. 121-22.) After disregarding those findings, Dr. Warren concluded that Ms. Rives had: no limitation in ability to understand, remember, or apply information, interact with others, or adapt and manage oneself; a mild limitation in ability to concentrate, persist, or maintain pace; and no current evidence of a severe mental health impairment. (Tr. 122.) On March 2, 2019, state agency reviewing medical consultant Karla Delcour, Ph.D, affirmed Dr. Warren's opinion, adding only that Ms. Rives was also mildly limited in her ability to interact with others. (Tr. 139-41, 157-58.)

### C. Cooperative Disability Investigations Unit ("CDIU") Fraud Investigation Findings

On July 27, 2018, as a result of an allegation of fraud or similar fault identified by the Ohio Disability Determination Service (DDS), Ms. Rives' case was opened for an investigation by the Cooperative Disability Investigations Unit ("CDI Unit" or "CDIU"). (Tr. 647.) During the initial development of Ms. Rives' claim, DDS "discovered areas of conflict in the medical evidence of record in comparison to Rives' presentation and statements regarding her alleged limitations." (*Id*.) DDS then referred the matter to the CDI Unit, requesting assistance resolving the following areas of conflict:

- Determine Rives' ability to stand, walk, and move about;

- Describe Rives' physical appearance, grooming, and demeanor during contact;

- Determine Rives' ability to answer questions and provide relevant information;

- Determine Rives' activities for a typical day;

- Determine Rives' level of social activity;

- Determine if Rives is still working.

(Tr. 647-48.)  DDD also requested that CDIU obtain information that it could from a

disinterested third party.  (Tr. 648.)

The October 30, 2018 CDIU report reflected the following details of the investigation:

During the morning hours of Tuesday, October 16. 2018, Detective Ted Sloan and Detective James Bartlett arrived at 240 East 214th Street in Euclid, Ohio, which is the last known address for Kimberly RIVES according to Social Security Administration (SSA) records.  Upon arrival, the detectives could not make contact with anyone at the residence, a neighborhood canvass did not produce a viable source of information, and Detective Bartlett left his business card in the side door or the residence asking Rives to call him. A short time later, RIVES called Detective Bartlett and they spoke about an unrelated law enforcement matter and she agreed to meet with the detectives on Thursday, October 18. 2018, around 12:30 pm when she got done with work.

On the listed day and time, the detectives arrived back at the listed address and spoke with RIVES about an unrelated law enforcement matter and observed her as she provided the following information:

Upon arrival, Detective Bartlett and Detective Sloan found the exterior of the residence to be well maintained, the landscaping well kept, and the yard well groomed. RIVES came to the door and invited the detectives in. She walked across the living room floor with a normal gait and unassisted.  She bent over at the waist and sat down on the couch. She did all or this unassisted, with no apparent difficulty or complain and was not using any type of walking aide. There was no walking aide observed in the immediate area of the interview.  The interior of the residence was very well kept and organized.

RIVES reported that she is currently living at the listed residence with her fiancé, Wayne, and her daughter. She was currently home alone as Wayne works in the early morning until l pm.  Her daughter has Downs Syndrome and was currently not home.  She has been at her current residence for the past three years and before that, she lived at 1121 East 144th Street in Cleveland, Ohio, for twelve years. She carried on a normal conversation and never needed anything simplified. She spoke

24

in a clear and concise voice and used full and complex sentences. She asked several questions relevant to the conversation and was very talkative.  RIVES appeared comfortable talking with Detective Sloan and Detective Bartlett. She was able to maintain appropriate eye contact and never shied away from the conversation. She was polite, friendly, cooperative, and was laughing and joking during the interview.

RIVES provided her Social Security number [xxx-xx-xxxx], and her cell phone number, [(xxx)xxx-xxxx], from memory and without hesitation.

RIVES was able to follow directions by looking at a photograph provided to her as part of the unrelated law enforcement matter. She flipped the photograph over as directed and read the name aloud on the back of the photograph.  She looked and positively identified Bureau of Motor Vehicle pictures of herself from 2014 and dating back 1998.

RIVES reported that she is currently working for the Ohio Department of Medicaid and Humana Senior Bridge. She just applied for a job at Cherished Companion Home Care and has an interview with them on Monday, November 22, 2018.  She never mentioned being disabled, the nature of her disability, or not being able to work.  She did mention that one of her neighbors is a supervisor at a local SSA Field Office.

RIVES reported using the internet on a regular basis on her tablet.  She has two active email accounts and uses the internet to apply for jobs.  She checks her credit on a regular basis using Credit Karma.  She uses a regular Motorola smart phone.

RIVES reported that she knows the location of Toledo, Ohio, but only travels through there on her way to the casino in Michigan.  She also goes to one [of] the casinos in Pennsylvania. She reported being friends and friendly with most of her neighbors. They drink summer shandy with one of the neighbors.

RIVES reported that her only bank account is located in California and only uses a pre-paid debit card. She owns a vehicle and drives on a regular basis.

RIVES reported that she filed an Internal Revenue Service (IRS) tax return in 2018 for the tax year 2017. Rives was able to provide the name of the person whom prepared her tax return.

During the entire interview, which lasted approximately 20 minutes, RIVES never cried, appeared fragile, erratic, emotional, or unstable.

Upon leaving, RIVES shook Detective Bartlett's right hand with her right hand with a normal grip and thanked the detectives for their help. She followed the detectives out the front door, walked down three steps, bent over at the waist and

picked up something off the ground, and got into her large SUV. She did all of this unassisted and with no apparent difficulty or complaint.

A neighborhood canvas did not produce a viable source of information.

Internet research of the Ohio Law Enforcement Gateway (OHLEG) revealed that RIVES has a valid Ohio Driver License . . .  She has no traffic or criminal offenses occurring after her alleged onset date of January 11, 2017.

Internet research revealed that RIVES maintains a social media account on Facebook and appears to be more active and social with her family and friends than she presents.

(Tr. 651-53.)

Following its review, DDS concluded that there was reason to believe that Ms. Rives

"knowingly provided incorrect information" in connection with her disability claim.  (Tr. 117;

*see also* Tr. 158.)  In reaching this determination, DDS observed the following:

RIVES reported to the DDS adjudicator that her depression affects her ability to work.  RIVES said she is not able to work and is depressed because she is used to working. RIVES was discharged from speech /language therapy in 6/2017 after having met or partially met all treatment goals despite inconsistent attendance. There is no further complaint of ongoing memory or cognitive deficits in her treatment notes. At a physical medicine evaluation 1/22/18, RIVES was noted to be following up after a concussion. Her mental status exam was unchanged and her affect was bright.

***

RIVES presentation at the psychological consultative examination conflicts with her presentation at the physical exam only one day later. Treating source records note RIVES regularly displays bright affect and is cooperative. Treating exam notes show no indication of the severe symptomology that RIVES displayed during psychological CE. During the interview with detectives, RIVES carried on a normal conversation and spoke in a clear and concise voice and used full and complex sentences. RIVES was very talkative and appeared comfortable. She was polite, friendly, cooperative, and was laughing and joking during the interview. RIVES reported to detectives that she is currently living at the listed residence with her fiance, Wayne, and her daughter. She reported being friends and friendly with most of her neighbors and stated that they drink Summer Shandy with one of the neighbors. Internet research revealed that RIVES maintains a social media account on Facebook on which she posts numerous photos of herself out of the house and

26

with various children (unclear of their relationship to her). This is inconsistent with Rives' report at the psychological CE when she noted not having any friends, not having a social support system, and not engaging in any social activities.

There is also noted inconsistencies in RIVES' reports of physical limitations. During a call with the DDS, RIVES reported having constant headaches to the point that her eyes shut. She stated that her back injury and pain cause her knees to buckle; however, she denied using any ambulatory aid. RIVES estimated that she can walk approximately 50 feet at one time. She stated she could lift and carry 50 pounds. In her initial visit to the ER, RIVES noted blurry vision, but did not mention any "flashing lights". Treating source exams have not noted any mention of ongoing visual disturbances. A physical medicine evaluation 1/22/18 noted RIVES was following up after a concussion. Her motor strength was 5/5 in all limbs and gait testing showed normal stance and stride.

RIVES presented for a physical CE on 4/25/18 and reported seeing flashing lights in the right eye and having headaches. She stated that she could only stand /walk for two hours. On exam, RIVES displayed normal strength in all muscle groups and normal range of motion of all joints. Her gait was even and regular with no apparent limp, shuffle, or other disturbance. During investigation, the detectives noted RIVES walked across the living room floor with a normal gait. She bent over at the waste [sic] and sat down on the couch. At the conclusion of the interview, RIVES followed the detectives out the hors [sic] door, walked down three steps, and bent at the waist to pick up something off the ground. She then got into her large SUV with no apparent difficulty or complaint.

(Tr. 117-18.)

As a result, DDS found it appropriate to disregard information provided by Ms. Rives regarding her abilities, activities, and functioning during her clarifying call, and to disregard the findings in her psychological consultative evaluation. (Tr. 118, 158; *see also* Tr. 163, 168.)

## D. Hearing Testimony

### 1. Plaintiff's Testimony

At her December 10, 2019 hearing, Ms. Rives testified in response to questioning by the ALJ and her representative. (Tr. 42-65.) Ms. Rives indicated that she would be unable to work at her prior job because it involved lifting patients, walking for twelve hours, and going up and down between floors. (Tr. 51-52.) However, she was working a different job at the time of

hearing.  (Tr. 58.)  She explained that she had a client in a wheelchair, who she found through "MyOhioHCP" (Tr. 58-59), presumably referring to the Ohio Home Care program website at myohiohcp.org.  She worked three days per week, driving herself to her client's trailer, with job duties that included vacuuming, dishes, and providing companionship.  (*Id*.)

Ms. Rives described her living situation, explaining that she lived with her boyfriend and her adult daughter who has her own physical and mental impairments, including Down syndrome.  (Tr. 42, 44.)  Ms. Rives reported that although her daughter could take care of some of her own personal needs, Ms. Rives had to assist her daughter with some personal and daily activities including talking to her doctors, choosing appropriate clothing, providing medication reminders, and assisting her with putting on her shoes.  (Tr. 43-44.)   Ms. Rives reported that her boyfriend took care of most household chores, but she did the cooking.  (Tr. 45.)

Ms. Rives explained that she had not been the same since she was thrown into a wall on January 11, 2017.  (Tr. 45.)  She reported not being able to stand or walk for longer than an hour, and only being able to lift a small basket of clothes.  (Tr. 45, 52.)  She reported that she would need to sit and rest for about forty minutes after walking for an hour.  (Tr. 52.)  She also explained that she suffered from post-concussive syndrome that caused constant pressure, ringing in her ears, and seeing spots.  (Tr. 55.) She was unable to quantify how long she could sit before needing to stand, but stated that she needed to stand during the hearing.  Tr. 57.  She stated that lying down did not help with her physical problems because she was unable to lie on her left side.  (*Id*.)  Ms. Rives also discussed another incident that involved being hit by a baseball bat in her left arm.  (Tr. 52-53.)  Although her injury from the baseball bat incident was healed, she reported still having problems lifting and reaching for things.  (Tr. 52-55.)

28

Ms. Rives also reported that she had attempted to hurt herself, so that her boyfriend regularly called her every thirty minutes to make sure she was okay, and locked up and managed her medications.  (Tr. 45-47.)  She reported that her last suicide attempt was about two months prior to her hearing, when she overdosed on Melatonin pills.  (Tr. 46.)

On a typical day, Ms. Rives stated that she sat in her room with the television on at a low volume, and sometimes read.  (Tr. 47-49.)  She explained she often just flipped through different television stations and tried to watch shows that she had recorded, but usually did not end up watching them. (*Id*.)  She reported having no hobbies and no friends.  (Tr. 49-50.)

Ms. Rives explained the only bathroom in her house was downstairs and that she had to use a urinal when she was unable to get downstairs to the bathroom, which was most mornings and evenings.  (Tr. 50.)   She reported that going up and down stairs is "killer" for her unless she is wearing "copper sleeves" on her knees which she stated "work miracles." (Tr. 50-51.)

Ms. Rives discussed her hip pain, explaining that she had tried a cortisone shot but was "nearly bedbound" for the first seventy-two hours after receiving the shot, and had to use a bedpan.  (Tr. 51.)  She reported having pain relief for about six months following those first seventy-two hours, but stated she would not have a shot again since the experience was so difficult.  (*Id*.)  She also discussed her back pain, stating that her back constantly hurt and she used a lidocaine patch for her back pain.  (*Id*.)

Ms. Rives indicated that her medications included Effexor for bipolar disorder and Melatonin for sleep.  (Tr. 63-64.)  She reported that her medications caused side-effects, including diarrhea and sleepiness.  (Tr. 57.)  However, she also said that she was unable to sleep throughout the night because of hearing things in the house that scared her.  (*Id*.)

29

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing (Tr. 65-72) and classified Ms. Rives'

past work as that of a nurse assistant, an SVP 4, medium exertional job performed by Ms. Rives

at the very heavy level.[1] (Tr. 66).

For his first hypothetical, the ALJ asked the VE to assume an individual with the past job

as described who:

> would fall within the exertional category of medium, but would have the following
> further restrictions. The hypothetical individual would be limited insofar as they
> would -- excuse me, they would only occasionally be required to use ramps and
> stairs. Never use ladders, ropes or scaffolds. The hypothetical individual could
> frequently balance, stoop, kneel, crouch and crawl. The hypothetical individual
> would be limited further, insofar as they would be limited -- that, that would be the
> extent of the restrictions, let's strike that. Now the hypothetical individual would
> be limited to simple tasks. Limited to routine, repetitive tasks. The, hypothetical
> individual would be limited further, insofar as they would be restricted from
> hazards such as heights and machinery. Be able to avoid ordinary hazards in the
> workplace such as boxes on the floor, doors ajar, or approaching people or vehicles.

(Tr. 67.) The VE testified that the hypothetical individual would not be able to perform Ms.

Rives' past work. (*Id.*) However, the described individual would be able to perform other jobs

in the national economy, including laundry worker, hospital cleaner, and stores laborer. (Tr. 68.)

The VE indicated that the identified jobs were medium exertional level and she provided national

job incidence data for each job. (*Id.*)

For his second hypothetical, the ALJ asked the VE to consider the same restrictions as the

first hypothetical but at the light exertional level. (Tr. 68-69.) In response, the VE indicated that

---

[1] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20
CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP
of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." (*Id.*)

the following jobs would be available: inspector and hand packager, office helper, and small products assembler. (Tr. 69.) The VE provided job incidence data for each job. (*Id*.)

The VE further testified that there would be no jobs available if the hypothetical individual would be off task twenty percent of the workday. (Tr. 69.) She explained that most employers tolerate an employee being off task up to ten percent of the workday. (Tr. 70.) She also testified that most employers tolerate one to two absences per month, but not on a regular basis and a maximum of approximately six per year. (*Id*.) If an employee had to be redirected six to eight times during a workday, the VE indicated the individual would not be able to maintain work. (*Id*.)

When asked about the impact on the first two hypotheticals if the hypothetical individual could only have "occasional interactions with supervisors and coworkers" and "only indirect and superficial contact with the general public," such that she would be able to direct someone to the restroom if asked, but nothing beyond that or another "similar scenario," the VE testified that her responses to the first two hypotheticals would not change. (Tr. 70.)

When asked about the impact on the first two hypotheticals if the individual could only lift up to ten pounds with her non-dominant arm, the VE responded that there would be no jobs available under the first hypothetical, which was at the medium exertional level. (Tr. 71.)

When asked about the impact on the first two hypotheticals if the individual could only stand or walk for one hour, and then would need to sit for at least forty minutes before standing again for another hour, but could maintain work while sitting, the VE responded that there would be no jobs available for the individual described in the first hypothetical, which was at the medium level. (*Id*.) However, she testified that there would be jobs available for the individual in the second hypothetical, which was at the light exertional level, but that she would reduce the

31

available job numbers in the national economy for the inspector and hand packager and small

product assembler jobs by 50%.  (Tr. 71-72.)

The VE also testified that there would be no work available at the light level if the

individual could stand or walk for less than four hours out of an eight-hour day.  (Tr. 72.)  If the

individual was limited to work at the sedentary level, the VE testified that neither Ms. Rives'

past work nor any of the jobs identified in response to the hypotheticals would available.  (*Id*.)

E.    **Lay Witness Statements**

The following witnesses submitted statements in connection with Ms. Rives' disability

claim: (1) Kelli Rives (Tr. 693); (2) Mrs. Foster (Tr. 689-90); and (3) Wayne Isom (Tr. 691-92).

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  Disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.      The ALJ's Decision

In his February 5, 2020 decision, the ALJ made the following findings:[2]

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2022. (Tr. 18.)

2.      The claimant has not engaged in substantial gainful activity since January 11, 2017, the alleged onset date.  (Tr. 18.)

---

[2] The ALJ's findings are summarized.

3.     The claimant has the following severe impairments: degenerative disc disease of the lumbar spine with noted endplate changes; lumbosacral arthritis; left-hip bursitis; left-knee osteoarthritis; obesity; post-concussive disorder; posttraumatic stress syndrome; personality disorder; bipolar disorder; and depression.  (Tr. 18-19.)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 19-21.)

5.     The claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c) except the she can occasionally use ramps and stairs but can never use ladders, ropes, or scaffolds; can frequently balance, kneel, stoop, crouch, and crawl; can perform no more than simple, routine, and repetitive tasks; is restricted from hazards such as height or machinery but can avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people and vehicles. (Tr. 21-27.)

6.     The claimant is unable to perform any past relevant work. (Tr. 27.)

7.     The claimant was born in 1964 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  (Tr. 27.)

8.     The claimant has a limited education and is able to communicate in English.  (Tr. 28.)

9.     Transferability of job skills is not material to the determination of disability.  (Tr. 28.)

10.    Considering the claimant's age, education work experience, and RFC, there are jobs that exist in significant number in the national economy that he can perform such as laundry worker.  (Tr. 28.)

Based on the foregoing, the ALJ determined that Ms. Rives had not been under a

disability, as defined in the Social Security Act, from January 11, 2017, through the date of the

decision.  (Tr. 29.)

### V.      Plaintiff's Arguments

Plaintiff raises the following legal issues:

1.  Whether the appointment of Mr. Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers such that the decision in Ms. Rives' case by an ALJ who derived his authority from Mr. Saul is constitutionally defective?

2.  Whether the ALJ committed harmful error when he failed to support his RFC with substantial evidence and ignored evidence which supports Ms. Rives' claims?

(ECF Doc. 13.)

### VI.      Law & Analysis

#### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

35

(6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406, *quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004))); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will not be upheld if the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result.*" *Fleischer v. Astrue*, 774 F.

Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether Ms. Rives Has Standing to Challenge ALJ Decision Based on Alleged Separation of Powers Violation by the Commissioner**

Ms. Rives argues that the ALJ decision here is "constitutionally defective" because the appointment of the former Commissioner of Social Security violated separation of powers principles.  (ECF Doc. 13 pp. 8-10; ECF Doc. 18.)  Specifically, she argues based on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, ––– U.S. ––––, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020) that the statute under which the former Commissioner was appointed violated separation of powers principles by allowing him to serve a longer term than the President of the United States while protecting him from removal except for cause, similar to the statute found unconstitutional in *Seila Law*.  (ECF Doc. 13 p. 9 (challenging 42 U.S.C. § 902(a)(3)).)  Ms. Rives argues based on this precedent that the ALJ's authority to issue the decision in this case was "constitutionally defective" because his authority was delegated from the Commissioner, and because the ALJ's decision was improperly based on regulations promulgated by the former Commissioner without authority.  (ECF Doc. 13 pp. 8-10; ECF Doc. 18 pp. 1-4.)

The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause" (ECF Doc. 16 p. 7 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)), but argues that Ms. Rives is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused her harm." (*Id.* (citing *Collins v. Yellen*, –––

U.S. ——, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).)  More specifically, the

Commissioner argues that Ms. Rives cannot show harm to support her claim for relief because

the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the

challenged removal restriction, and because Ms. Rives cannot show that the removal restriction

caused the denial of her benefits.  (ECF Doc. 16 p. 7.)

Having considered the arguments of the parties and the applicable law, the undersigned

agrees with numerous other courts that Ms. Rives' constitutional challenge to a statutory removal

provision for the Commissioner of Social Security suffers from a fundamental deficiency in this

individual Social Security disability appeal, namely that Ms. Rives lacks standing to assert the

challenge.[3]  *See Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 WL 6064754, *9 (N.D.

Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d ---, 2021 WL 5882671, at

*10 (N.D. Ohio Dec. 13, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, No. 3:20-cv-5602-

TLF, 2021 WL 5276522, *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No.

20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*,

No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No.

21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

Standing is a threshold issue, and a failure to establish standing means a court cannot

address the merits of a claim.  *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118

S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it

ceases to exist, the only function remaining to the court is that of announcing the fact and

---

[3] The Commissioner also argues that Ms. Rives' request for relief under *Seila Law* fails under other legal and
equitable doctrines, including harmless error, de facto officer, the rule of necessity, and broad prudential
considerations.  (ECF Doc. 16 pp. 7-19.)  Because the undersigned concludes that this Court does not have standing
to hear the relevant constitutional arguments, these additional arguments will not be addressed herein.

dismissing the case.")  Although the Commissioner did not directly challenge Ms. Rives' standing in this case, this Court has the ability and the obligation to raise the issue of standing *sua sponte* where it is in doubt.  *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").  Indeed, "[a]s a jurisdictional requirement, standing ... cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, ––– U.S. ––––, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019).  Moreover, it is noted that the primary defect challenged by the Commissioner in her briefing – that Ms. Rives did not suffer actual harm caused by the statutory removal provision – is also a key element of the standing analysis discussed herein. (ECF Doc. 16 p. 7.) *See also Rhouma*, 2021 WL 5882671, at *10 (raising standing *sua sponte* when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not established a 'nexus' between § 902(a)(3)'s removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, Ms. Rives must satisfy a three-pronged test to establish Article III standing, namely: "[she] must show that [she] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).

Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [she] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void."  141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779

(finding standing to challenge statutory removal protection for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 (("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and internal quotation marks omitted))).   However, the Court explicitly clarified that this "holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone."  141 S. Ct. at 1788, n. 24.

As the party invoking federal jurisdiction in this case, Ms. Rives bears the burden of establishing standing for each claim and form of relief.  *See Loren*, 505 F.3d at 607 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 1867, 164 L.Ed.2d 589 (2006).  Ms. Rives argues that the requirements for standing are met because the Commissioner did not argue otherwise, and for the reasons set forth in two district court cases addressing similar constitutional challenges.  (ECF Doc. 18 pp. 1-2 (citing *Brinkman v. Kijakazi*, No.  2:21-CV-00528-EJY, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-CV-076-M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), *report and recommendation adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021).)  Given that standing cannot be waived or forfeited, the pertinent question is whether Ms. Rives has successfully demonstrated that the "traceability" requirement is met in this case.

The court in *Brinkman* did face a similar challenge to an ALJ decision based on the alleged unconstitutionality of the statutory removal provision for the Commissioner of Social Security under *Seila Law*.  2021 WL 4462897, at *1.  And contrary to the argument offered by

Ms. Rives in this case, the *Brinkman* court held: "Plaintiff cannot establish traceability. <u>Because</u> <u>Plaintiff cannot demonstrate traceability, she lacks standing to bring her constitutional</u> <u>challenge</u>." *Id.* at *2 (emphasis added).  Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing." *Id.* (citing *Seila Law*, 140 S.Ct. at 2196 and *Collins*, 141 S.Ct. at 1779).  This case clearly does not support a finding that Ms. Rives has demonstrated standing to pursue her constitutional claim in this case.

In contrast, the court in *Sylvia* found that the "traceability" requirement was met for a similar challenge "[b]ecause the ALJ derives authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3.  In so finding, the court relied in part on another court's observation that "[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate." *Id.* (quoting *Tafoya v. Kijakazi*, No. 21-CV-00871-REB, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)).  Indeed, the *Tafoya* court went on to state: "Under those conditions, the ALJs themselves ostensibly are operating without constitutional authority, and their disability determinations – which again, are the decisions of the Commissioner – arguably are null." *Tafoya* 2021 WL 3269640, at *5.

Consistent with the findings in *Sylvia* and *Tafoya*, Ms. Rives asserts that the ALJ decision here was "constitutionally defective" because the ALJ's authority was delegated by the Commissioner.  (ECF Doc. 13 p. 9; ECF Doc. 18 p. 4.)  In other words, she contends that the ALJ lacked authority to issue the present decision because the Commissioner lacked the ability to delegate that authority to him.  However, such a finding is in direct conflict with the Supreme

Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S.Ct. at 2207-2211).  The *Collins* Court explained because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer, but "there was no constitutional defect in the statutorily prescribed method of appointment to that office," there was accordingly "no reason to regard any of the actions taken by the [agency] … as void."  *Id.* at 1787 (emphasis in original).  In so finding, the Court distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," including the holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id.* at 1788 (citations omitted).  Thus, the Court distinguished the impact of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.

Based on the Supreme Court's explicit findings in *Collins*, there is no legal basis for the undersigned to conclude that actions of the SSA Commissioner or the ALJ in this case were automatically void or lacking in authority.  Thus, the determination must return to the question whether Ms. Rives was "harmed by an action that was taken by [the SSA Commissioner] and that [she] alleges was void."  *Collins*, 141 S. Ct. at 1788, n. 24.  In addition to arguing that the ALJ lacked delegated authority to issue his decision, Ms. Rives asserts that the ALJ decided this case "based on regulations promulgated by Mr. Saul when he had no authority to issue the same," and more specifically that the former Commissioner "implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and

"modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015."  (ECF Doc. 13 p. 9-10; ECF Doc. 18 p. 3.)

First, Ms. Rives' arguments on this point are underdeveloped, as she has given no argument or explanation as to how the identified actions by the Commissioner are traceable to any harm suffered in the present case.  To demonstrate standing, Ms. Rives must show that the policy and/or regulatory changes implemented by the former Commissioner adversely affected her. *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way.").  Second, even a cursory review of the actions of the former Commissioner identified by Ms. Rives reflects that those actions are not traceable to harm asserted by Ms. Rives in this case.  As to the identified changes to HALLEX, an internal procedural manual for the Social Security Administration, the cited change pertains to the way that Office of Hearings Operations staff will respond when a notice of hearing acknowledgement is not returned.  *See* HALLEX I-2-3-20.[4]  No challenge is raised in this case regarding deficiencies with the notices of hearing.  As to the identified changes to the musculoskeletal listings, it is evident that the identified changes took effect on April 1, 2021, more than one year after the ALJ's decision in this case (Tr. 12-34), and thus could not have impacted this decision.  *See* DI 34121.013.[5] Unlike the shareholders in *Collins*, whose injury – the loss of net worth in companies in which

---

[4] The February 23, 2021 revision of HALLEX I-2-3-20 "updated and clarified the action that Office of Hearings Operations (OHO) staff will take if a claimant or appointed representative does not return an acknowledgment of the notice of hearing."  Transmittal I-2-240, Soc. Sec. Admi. Office of Analytics Review and Oversight, available at https://www.ssa.gov/OP_Home/hallex/TS/tsi-2-240.html#:~:text=This%20transmittal%20amends%20section%20I-2-3-20%20of%20the%20Hearings%2C,404.938%20and%20416.1438.%20Explanation%20of%20Content%20and%20Changes (last visited 1/12/2022).

[5] https://secure.ssa.gov/poms nsf/lnx/0434121013 (last visited 1/12/2022).

43

they owned shares – was directly traceable to the Federal Housing Finance Agency Director's amendment of the formula to calculate dividends, here Ms. Rives has not demonstrated that the regulatory changes she identifies impacted the denial of benefits. *Collins*, 141 S. Ct. at 1779.

Consistent with the findings of other courts, the undersigned therefore concludes that Ms. Rives has failed to establish that she has suffered harm traceable to an unlawful action by the former Commissioner of Social Security, and has accordingly failed to establish standing to pursue this constitutional challenge. *See, e.g., Rhouma*, 2021 WL 5882671 at * 11 ("Without a harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to challenge the constitutionality of § 902(a)(3)."); *Catherine J.S.W.*, 2021 WL 5276522 at *8 ("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner Saul, under *Collins v. Yellin,* 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments."); *Helms*, 2021 WL 5710096 at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.").

Because the undersigned concludes that Ms. Rives does not have standing to proceed with her separation of powers constitutional claim, the undersigned recommends that the Court deny Ms. Rives' request for a remand based on the asserted constitutional challenge.

**C.**     **Second Assignment of Error: Whether ALJ Failed to Support RFC With Substantial Evidence and Ignored Evidence Supporting Ms. Rives' Claims**

Under the umbrella of what is described as a single assignment of error, Ms. Rives has attempted to raise numerous discrete and unrelated arguments in a manner that is neither clear nor appropriately developed.  (ECF Doc. 13 pp. 10-21.)  While the undersigned has undertaken to parse out those arguments that meet the bare minimum of standards to identify an issue for determination by this Court, it is noted that a reviewing court is not required to "make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments." *Crocker v. Comm'r of Soc. Sec.*, No. 1:08-CV-1091, 2010 WL 882831, at *6 (W.D. Mich. Mar. 9, 2010) (*citing Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir.1995); *Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (E.D. Mich. Feb. 25, 2014) (pointing out plaintiff's skeletal arguments and noting that "plaintiff's brief did not provide much of a roadmap to help the Court navigate her claims of error").

Indeed, where arguments are not fully developed, a court may find the arguments waived. *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."); *Hough*, 2014 WL 764634, at *9 (relying on *McPherson* when noting plaintiff did not sufficiently present her claimed errors); *Ray v. Saul*, No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

Upon review of Ms. Rives' brief, the undersigned has determined that the following issues were sufficiently identified and argued: (1) whether the ALJ erred or failed to consider the effects of pain when finding Ms. Rives could perform medium exertional work (ECF Doc. 13 pp. 13, 17-18, 20, 21); (2) whether the ALJ erred in finding she had no more than mild to moderate limitations in the four categories of mental functioning at Step Three (ECF Doc. 13 pp. 14-17); (3) whether the ALJ failed to consider the combined effects of her physical and psychological impairments (ECF Doc. 13 p. 17); (4) whether the ALJ failed to analyze her obesity under SSR 19-2p (ECF Doc. 13 pp. 18-19); and (5) whether the ALJ erred in failing to address letters from third parties (ECF Doc. 13 p. 20).  Each of these arguments will be addressed in turn below.

All other issues identified by Mr. Reese were raised in a perfunctory manner, without developed or clearly articulated argument, and are therefore deemed waived.  *McPherson*, 125 F.3d at 995–996.  The issues which are waived in this case include her suggestion that "the ALJ was predisposed to finding that Rives was not disabled" (ECF Doc. 13 p. 11) and her vague references to Listings 1.02 and 1.04 without any logical or clearly organized challenge to the ALJ's Step Three findings with respect to those Listings (ECF Doc. 13 pp. 11-13.)  The undersigned will not endeavor to scour the record or filings in this case to develop Ms. Rives' arguments for her.  Counsel is strongly cautioned that the continued briefing of cases in this unclear and underdeveloped way may result in further waiver of arguments on appeal.

1.    **Whether ALJ Failed to Adequately Consider Effects of Pain in Finding Ms. Rives Capable of Medium Exertional Work**

Ms. Rives contends that the ALJ failed to sufficiently consider the effects of her pain in concluding that she could perform medium exertional work.[6]  (ECF Doc. 13 pp. 13, 17-18, 20-21.)  She notes that she would be disabled as of her fifty-fifth birthday if limited to light exertional work, and would be disabled as of her alleged onset date if limited to sedentary exertional work.  (ECF Doc. 13 p. 13 (citing Appendix 2 to Subpart P of Part 404, Rules 201.10 and 201.02.)  Thus, she contends it was reversible error for the ALJ to find she could perform work at the medium exertional level.  (*Id.*)

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, 81 Fed. Reg. 14166 (March 16, 2016) (republished as 82 Fed Reg. 49462 (Oct. 25, 2017) as to applicable date and to update citations to reflect revisions to regulations effective March 27, 2017)) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  An ALJ's findings based on the credibility of the applicant are to be accorded great

---

[6] To the extent Ms. Rives also argues the ALJ erred in assigning her a medium RFC because the RFC limitations were not supported by substantial evidence, the only evidence she asserts was disregarded by the ALJ is "objective evidence which supported [her] testimony regarding disabling pain" and "the residual effects of [her] back, knee, and hip problems," all of which are addressed in the section above.  (ECF Doc. 13 p. 19.)  Because Ms. Rives has not clearly articulated or appropriately developed a separate argument that the medium exertional RFC was not supported by substantial evidence, the undersigned finds that argument was waived.

47

weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

SSR 16-3p rescinded and supersedes SSR 96-7p and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because, as the SSA explained, the "regulations do not use this term." SSR 16-3p, 82 Fed Reg. 49462, 49463. The revised regulations clarify "that subjective symptom evaluation is not an examination of an individual's character." *Id*. Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the *consistency* of the individual's own statements" is considered. *Id*. at 14170 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, No. 2:18-cv-38, 2018 WL 6060449, *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness"), *report and recommendation adopted*, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019).

Notwithstanding this change in terminology, courts in this Circuit have continued to use the term "credibility" when reviewing an ALJ's assessment of a claimant's symptoms and continue to rely on case law using the old terminology. *See, e.g., Alexander*, 2021 WL 4459700, *14, n. 11; *Young-Roach v. Soc. Sec. Adm.*, No. 1:20-cv-1853, 2021 WL 4553128, *10 (N.D. Ohio Oct. 5, 2021); *Banks*, 2018 WL 6060449 at *5. These cases remain relevant because SSR 16-3p did not change the "two-step process" that an ALJ utilizes "when assessing the limiting effects of an individual's symptoms." *Martin v. Kijakzi*, No. 1:20-CV-117, 2021 WL 4066985, *5 (E.D. Tenn. Sept. 7, 2021); *see also Hoffman v. Comm'r of Soc. Sec.*, No. 1:20-cv-138, 2021

48

WL 4145626, *5 (W.D. Mich. Sept. 13, 2021) (explaining SSR 16-3p did not change "[t]he longstanding two-part analysis for evaluating symptoms.") (internal citations omitted). Thus, to the extent "credibility" is discussed herein, it refers to the governing caselaw, with the understanding that the underlying standard is more accurately described as one of "consistency."

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247. When the alleged symptom is pain, the ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c). *See Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994). Factors relevant to a claimant's symptoms such as pain include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3). There is no dispute that the first step is met in this case, so the discussion herein will focus on the second step.

Ms. Rives argues that the ALJ based his finding that she could perform medium work on her ability to vacuum for a client and serve as the payee for her disabled daughter, failing to consider the objective evidence supporting her testimony regarding disabling pain. (ECF Doc.

13 pp. 17, 19.)  The Commissioner argues the ALJ appropriately considered all of Ms. Rives'

subjective statements when constructing the RFC.  (ECF Doc. 16 p. 21 (citing Tr. 22-29).)

A review of the decision reflects that the ALJ provided an extensive discussion of Ms.

Rives' subjective allegations.  With respect to her complaints of physical pain, the ALJ noted her

testimony that: it hurt to stand or walk for more than an hour; she had to rest for forty minutes

before walking again; she had a hard time traveling down stairs at times; her knees locked up and

she needed to wear "copper sleeves" for mobility; she used lidocaine patches for her back pain;

she had difficulty lifting; she endorsed post-concussive symptoms, including constant pressure,

ringing in her ears, and seeing spots; she needed to stand during the hearing.  (Tr. 21.)   After

concluding that Ms. Rives' medically determinable impairments could reasonably be expected to

cause the alleged symptoms, the ALJ found that Ms. Rives' "statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely consistent with the medical

evidence or other evidence in the record for the reasons explained in this decision."  (Tr. 22.)

In reaching this conclusion, the ALJ considered evidence from the CDIU fraud

investigation, explaining:

> The [fraud] investigation notes show the claimant serves at the payee for her
> daughter's social security benefits. The examiners attached records showing the
> claimant was active on social media. The investigators interviewed the claimant in
> her home. The claimant walked unassisted with normal gait. The interior of the
> residence was very well kept and organized. The claimant could carry on a normal
> conversation. The claimant maintained appropriate eye contact and was polite,
> friendly, cooperative, and laughing and joking throughout the interview. The
> claimant was able to follow directions. The claimant stated that she uses the internet
> on a regular basis and uses email accounts to apply for jobs. During the entire
> interview, the claimant never cried or appeared fragile, erratic, emotional, or
> unstable.

(Tr. 22.)  Given the clear conflict between the findings of the fraud investigation and Ms. Rives

subjective reports of pain and limitation, it was entirely appropriate for the ALJ to consider

evidence from the fraud investigation when assessing the consistency of Ms. Rives' allegations with the record as a whole.  *See Vallee v. Comm'r of Soc. Sec.,* No. 1:19-CV-114, 2020 WL 3445598, at *8 (S.D. Ohio June 24, 2020) (report and recommendation finding "the ALJ reasonably considered the observations set forth in the CDIU report as a factor in assessing the credibility of plaintiff's alleged limitations"); *Tutt v. Berryhill*, No. 1:16CV204, 2017 WL 414163, at *14 (N.D. Ohio Jan. 31, 2017) (affirming Commissioner's decision where ALJ relied in part of evidence from fraud investigation when assessing claimant's credibility).

Ms. Rives contends that the ALJ erred in relying on evidence from the fraud investigation because "after the investigation, the State Agency noted that additional restrictions appeared necessary secondary to the evidence in the file."  (ECF Doc. 13 p. 21 (citing Tr. 158).)  Ms. Rives fails to identify what additional restrictions were found necessary following the fraud investigation, but a review of the cited transcript page reveals that this argument is without merit. On the cited page, state agency psychological consultant Karla Delcour, PhD., did conclude that "additional restrictions appeared necessary secondary to the evidence in file" at the reconsideration level of review.  (Tr. 158.)  However, the "additional restrictions" she applied were limited to a finding that Ms. Rives had mild limitations in her ability to interact with others. (*Compare* Tr. 157-158 *with* Tr. 122.)  Even with those additional restrictions, Dr. Delcour concurred with Dr. Warren's finding on initial review that there was no evidence of a severe mental health impairment.  (*Id*.)  This finding in no way suggests that the ALJ erred in relying on evidence from the fraud investigation when assessing Ms. Rives' subjective allegations.

When assessing Ms. Rives' subjective allegations, the ALJ also considered her work activity and medical evidence relating to treatment, examination findings, and medications.  (Tr. 21-25.)  The ALJ thoroughly discussed Ms. Rives medical treatment and examination records,

51

detailing how they showed conservative treatment for her injuries in 2017, normal physical examination findings in 2017 and 2018 while treating with over the counter medications, normal findings in her 2018 consultative examination, positive lumbar MRI findings in 2019 along with some symptomatic physical examination findings, but with continued conservative treatment that included naproxen and an injection, and headaches that were stable in 2019 with Ms. Rives indicating she did not want to follow treatment recommendations. (Tr. 22-25.) The ALJ also noted record references indicating that Ms. Rives had continued to work performing home health care, and that she found a job as a cashier but was advised not to work by her attorney. (Tr. 23-24.) Ultimately, the ALJ concluded that the specified medium RFC limitations were supported by records demonstrating Ms. Rives' conservative treatment, imaging showing mild to moderate changes, and her continued ability to engage in activities such as vacuuming for a client and serving as the payee for her daughter's benefits. (Tr. 27.)

The ALJ's consideration of Ms. Rives' part time work activity and conservative treatment was entirely appropriate in assessing the consistency of Ms. Rives' subjective allegations with the evidence in the record. *See e.g., Williamson v. Comm'r of Soc. Sec.*, No. 1:16-CV-583, 2017 WL 713904, at \*4 (S.D. Ohio Feb. 23, 2017), *report and recommendation adopted*, No. 1:16CV583, 2017 WL 1049561 (S.D. Ohio Mar. 17, 2017) (finding ALJ did not improperly rely on evidence of part-time work activity as a factor in assessing claimant's credibility); *McKenzie v. Comm'r, Soc. Sec. Admin.*, 215 F.3d 1327, at \*4 (6th Cir. 2000) (indicating that it is appropriate to consider evidence of conservative or nonaggressive treatment when assessing a claimant's credibility).

Ms. Rives argues that the ALJ's assessment of her subjective allegations is faulty because "the ALJ disregarded any medical findings which would have found that the combination of

Rives' impairments precluded her from engaging insubstantial gainful activity on a full-time sustained basis." (ECF Doc. 13 p. 21.) However, she offers no specific record citations in support of this argument, and this Court is not required to "make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments." *Crocker*, 2010 WL 882831, at *6. Moreover, the undersigned has carefully reviewed the underlying records and did not identify any material findings that were ignored or mischaracterized by the ALJ. (*See, e.g.,* Tr. 23-24 (discussing January 2019 lumbar spine MRI results, showing disc bulge and degenerated disc at various levels, positive straight leg raise test, reduced lumbar spinal range of motion, reduced reflexes, tenderness over the lumbar spine).)

Ms. Rives also contends that the "ALJ based his finding that Rives could perform work at the medium level of exertion on the fact that she was able to vacuum for a client (a trailer where she vacuumed and washed dishes at Tr. 58) and served as payee for her disabled daughter (Tr. 27).)" (ECF Doc. 13 p. 17.) While the ALJ did explicitly consider these activities, it was not improper for him to do so. *See Heston*, 245 F.3d at 535 (indicating ALJ properly considered other tasks that claimant could perform when assessing the credibility of her subjective complaints).)

A review of the decision as a whole reveals that the ALJ considered the entire record, based his determination on multiple factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467. In particular, the ALJ considered: (1) Ms. Rives' abilities as observed and noted in the fraud investigation; (2) physical examination findings, which were normal or partially symptomatic; (3) conservative treatment modalities, largely limited to medications, many of them over-the-counter, and disinterest in following treatment recommendations; (4) work history, including evidence of work activity

during the alleged disability period; and (5) activities of daily living, that included driving, cooking, vacuuming for a client, and caring for a disabled adult daughter.  (Tr. 22-27.) Consideration of such evidence was not improper.  This analysis of Ms. Rives' subjective allegations is well supported by substantial evidence, which "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (internal quotation omitted).

For all of the reasons set forth above, the undersigned finds that the ALJ properly considered and weighed Ms. Rives' subjective allegations against the other evidence in the record, and applied RFC limitations that were supported by substantial evidence.

### 2. Whether ALJ Erred in Determining Ms. Rives Does Not Meet or Medically Equal Listings 12.04, 12.06, or 12.15

Ms. Rives argues that the ALJ erred in finding that she had only mild to moderate limitations in her ability to understand, remember or apply information, interact with others, concentrate, persist or maintain pace, and adapt or manage herself.  (ECF Doc. 13 pp. 14-17.) She contends that "[i]n making his Step Three determination . . . that ALJ failed to provide any support for his findings that Rives did not have problems which seriously limited her ability to independently, appropriately, effectively, and on a sustained basis perform activities in the functional areas."  (*Id.* at 16.)

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and*

*Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Furthermore, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 728 (6th Cir. 2004).

Here, the ALJ stated the following at Step Three regarding Ms. Rives' mental impairments:

> Listing 11.18 requires evaluation of the claimant's cerebral trauma under the requirements of listings 11.02, 11.03, 11.04, and 12.02, as applicable. However, there is no evidence that the claimant has experienced epilepsy or a central nervous system vascular accident as required by listings 11.02, 11.03, and 11.04. In addition, the evidence fails to show that the claimant has experienced deficits in cognitive functioning, as described in 12.02(A), resulting in two marked restrictions under 12.02(B). Therefore, listing 11.18 is not met.
>
> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> ***
>
> In understanding, remembering, or applying information, the claimant has moderate limitations. The claimant did not allege any particular issues in this area. However, the claimant also stated that she could perform simple maintenance for clients such as vacuuming, prepare meals, take medications, and drive.
>
> In interacting with others, the claimant has mild limitations.  The claimant did not allege any problems related to this domain.  However, according to her statements, the claimant is also able to live with others.  Finally, the medical evidence shows that the claimant was described as cooperative.
>
> The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has moderate limitations.  First of all, the claimant did not note any specific issues in this area.  The record shows the

claimant can drive, prepare meals, use the internet, and handle her own medical care.

Finally, the claimant has mild limitations in her ability to adapt or manage herself. The claimant did not allege any symptoms or limitations that relate to this criterion. Furthermore, the claimant also stated that she is able to care for children. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 19-20.)

Ms. Rives contends that the ALJ's finding of mild to moderate limitations in the four functional areas is not supported by her testimony or medical evidence. (ECF Doc. 13 p. 14.) In support of this contention, she notes first that Ms. Rives was terminated from work for inappropriate behavior involving conflicts with patients and another employee, and argues that the ALJ therefore erred in finding she had no more than mild limitations in interacting with others. (*Id.* (citing Tr. 336, 338).)

The ALJ based his classification of Ms. Rives' limitations in interacting with others on factors that included her ability to live with others and examination notes reflecting that she presented as cooperative. (Tr. 20.) The ALJ also noted that Ms. Rives lived with her boyfriend and adult daughter with Down syndrome, and that she was responsible for cleaning up after her daughter, talking to her daughter's doctors, reminding her daughter to take medications, and helping her daughter to pick out clothing. (Tr. 22.) He also considered fraud investigation results reflecting that Ms. Rives presented as friendly, cooperative, and polite, and described being active on social media. (*Id.*) He acknowledged her termination following conflicts with patients and coworkers. (*Id.*) He noted that she reported continued work in home health care and presented with a "bright" affect. (Tr. 23.) In psychiatric treatment notes, he acknowledged

56

that she sometimes presented with a depressed mood, but noted a full range of affect.  (Tr. 24.)

He noted that psychiatric consultative examiner Dr. Whitlow opined that she did not appear to

have limitations in interacting with others.  (Tr. 26.)  Given all of the information explicitly

considered by the ALJ, including Ms. Rives' history of termination due to conflicts with patients

and coworkers, the undersigned finds that the ALJ was supported by substantial evidence in

finding no more than mild limitations in this functional area.

In further support of her challenge to the ALJ's findings regarding the mental listings,

Ms. Rives points to Dr. Whitlow's findings in the psychiatric consultative examination, and

notes that the ALJ found this opinion was not consistent with the medical records.  (ECF Doc. 13

p. 15.)  She also points out that the ALJ reviewed the evidence concerning Ms. Rives' treatment

for memory and cognitive issues, concussion, headaches, depression, and PTSD.  (*Id.* at pp. 15-

16.)  After acknowledging that the ALJ reviewed the consultative examination and treatment

notes, Ms. Rives argues that he erred in concluding that the treatment records did not support

Ms. Rives' testimony or Dr. Whitlow's opinion as to her mental limitations.[7]  (*Id.*)  Effectively,

she argues the ALJ should have weighed the same evidence and come to a different conclusion.

Several things must be observed about Ms. Rives' argument on this point.  First, she is

the party who bears the burden to establish that her mental impairments meet or equal a listing.

Second, she has acknowledged that the ALJ considered the relevant medical evidence.  Third,

she had not identified specific medical records or findings that the ALJ has mischaracterized or

failed to discuss.  And fourth, other than the interaction limitations discussed above, she has not

---

[7] Ms. Rives does not make a clear or developed argument specifically challenging the ALJ's findings as to the persuasiveness of Dr. Whitlow's opinion, and the Court will neither infer nor develop Ms. Rives arguments for her. Any challenge to the ALJ's findings as to the persuasiveness of this medical opinion is deemed waived.

identified specific findings at Step Three that she contends were in error.  These factors alone are sufficient to support a finding that Ms. Rives arguments here are unsupported and must fail.

Nevertheless, it is also noted that a review of the ALJ's decision reflects that his findings regarding the mental listings were supported by substantial evidence.  He considered Ms. Rives' activities of daily living, which included driving, preparing meals, using the internet, managing her own hygiene and medical care, and caring for a daughter with Down syndrome and her own home health clients.  (Tr. 20, 22.)  He considered her well-groomed and cooperative presentation at her medical appointments.  (*Id.*)  He considered her limited treatment for mental impairments.  (Tr. 24-25.)  He considered the findings of the psychiatric consultative examiner, which included some normal mental status findings, but also observations regarding her "erratic and frantic presentation" with "rambling, excessive, and off-task communication" and an "inability to stay on task."  (Tr. 24-25.)  But the ALJ also noted that the findings of the consultative examiner were not consistent with Ms. Rives' mental status examination findings in her own mental health treatment records.  (Tr. 26.)  He also acknowledged the fraud investigation that was specifically triggered by Ms. Rives' inconsistent presentation at the consultative examination, noting that she presented in that interview as well kept, organized, polite, friendly, and cooperative.  (Tr. 22.)  Based on a review of the record as a whole, as discussed and considered in the ALJ's decision, it is evident that the ALJ's findings as to Ms. Rives' level of limitation in the four categories of mental functioning at Step Three was supported by substantial evidence.

It is again emphasized that it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  The decision in this case clearly sets forth the basis for the ALJ's findings at Step Three, and the undersigned finds that the ALJ sufficiently articulated his Step Three analysis.

58

For all of the reasons set forth above, the undersigned finds that Ms. Rives has failed to meet her burden to show that his findings of mild to moderate limitations in the four functional areas are not supported by substantial evidence.

### 3.    Whether ALJ Failed to Consider Combined Effects of Impairments

Ms. Rives argues that the ALJ erred by not considering the effect of the combination of her physical and psychological impairments (ECF Doc. 13 p. 17.)  Her argument is again cursory in nature and lacking in substance.  Nevertheless, a review of the decision and the applicable law make clear that Ms. Rives' argument in this regard fails.

"In the Sixth Circuit, courts have held that 'an ALJ's finding that a claimant's combination of impairments (plural) did not meet or equal the Listings is sufficient to show that the ALJ had considered the effect of the combination of impairments,' so long as the ALJ has 'conducted sufficient analyses of each of the claimants' impairments after carefully considering the entire record.'"  *Malave v. Saul*, No. 1:18-CV-2747, 2019 WL 5552614, at *13 (N.D. Ohio Oct. 22, 2019), *report and recommendation adopted*, No. 1:18CV2747, 2019 WL 5552613 (N.D. Ohio Oct. 28, 2019) (quoting *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 789 (N.D. Ohio 2002), *citing Gooch v. Sec'y of Health and Human Servs*., 833 F.2d 589, 592 (6th Cir. 1987); *Loy v. Sec'y of Health and Human Servs*., 901 F.2d 1306, 1310 (6th Cir. 1990)) (finding ALJ adequately considered combined effect of impairments; reversing on other grounds).)

Here, the ALJ stated that Ms. Rives "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments."  (Tr. 19 (emphasis added).)  In reaching this finding, the ALJ analyzed Ms. Rives' impairments under multiple listings (*Id.* (evaluating Ms. Rives' multiple impairment under Listings 1.04, 11.18, 11.02, 11.03, 11.04, 12.02, 12.04, and 12.15).)  Ms. Rives fails to explain how the ALJ's

59

discussion at Step Three and in the balance of the decision was insufficient.  Ms. Rives'

disagreement with the ALJ's findings in her case is not a basis for reversal or remand where the

decision makes clear that he considered the combined effects of her impairments.  *See e.g.,*

*Malave*, 2019 WL 5552614, * 13 ("The standard of review in this area is deferential, and the

ALJ's statements that he considered the combination of Malave's impairments, combined with

his detailed assessment of the individual impairments in the opinion, constitute an adequate

consideration of the effect of Malave's combined impairments.).

　　　For the reasons set forth above, the undersigned finds that Ms. Rives has not met her

burden to demonstrate that the ALJ failed to consider the combined effects of her impairments.

### 4.　　Whether ALJ Properly Analyzed Obesity Under SSR 19-2p

　　　Ms. Rives also argues that the ALJ erred by failing to analyze her obesity as set forth in

SSR 19-2p.  (ECF Doc. 13 pp. 18-19.)  She contends that reversal and remand is warranted

because the ALJ only briefly mentioned SSR 19-2p and provided minimal discussion of her

obesity, which was found to be a severe impairment.  (*Id.*)  She argues further that the

combination of her "obesity and musculoskeletal problems equaled a Listing or at least

precluded her from engaging in work at the medium level of exertion."  (*Id.* at p. 19.)

　　　On May 20, 2019, the Social Security Administration published SSR 19-2p, which

rescinded and replaced the guidelines for evaluating obesity under SSR 02-1p.  Social Security

Ruling 19-2p "provides guidance on how [SSA] establish[es] that a person has a medically

determinable impairment of obesity," and how SSA "evaluate[s] obesity in disability claims."

SSR 19-2p, 84 Fed. Reg. 22924, 22924 (May 20, 2019).  In particular, SSR 19-2p provides that

"[t]he combined effects of obesity with other impairment(s) may be greater than the effects of

each of the impairments considered separately," and that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment."  *Id*. at 22925; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (noting that SSR 02-1p, the predecessor to SSR 19-2p, "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation") (citations omitted).

After finding obesity to be a severe impairment at Step Two (Tr. 18), the ALJ considered Ms. Rives' obesity at Step Three and at Step Four of the sequential evaluation process.  First, at Step Three, the ALJ stated:

> Pursuant to SSR 19-2p, obesity is not a listed impairment.  However, the functional limitations caused by the MDI of obesity, alone or in combination with another impairment(s), may medically equal a listing.  Moreover, obesity may or may not increase the severity of functional limitations of other impairments.  Upon review of the facts of this case, the claimant's obesity alone or combination with other impairments fails to rise to listing-level severity.

(Tr. 20.)  Then at Step Four, the ALJ considered Ms. Rives' obesity again, stating:

> Several notes indicated that the claimant is obese.  Treatment notes from April 4, 2019, indicated that the claimant was five feet and three inches in height and weighed 183 pounds (Exhibit B27F, page 6).  According to the National Institutes of Health, the claimant would have a body mass index ("BMI") of 32.42.  Pursuant to SSR 19-2p, the undersigned has considered the limiting effects of the claimant's obesity.  This includes that the combined effects of obesity with another impairment may be greater than the effects of each of the impairments considered separately.

(Tr. 24.)  At Step Four, the ALJ also considered extensive evidence that was previously discussed in this decision, including evidence of continued activities of daily living, fraud investigation findings reflecting that she walked unassisted with a normal gait, largely normal physical examination findings, lumbar MRI findings of mild to moderate arthropathy, and mild

61

disc bulge and mild stenosis, and some symptomatic examination findings but with conservative treatment throughout. (Tr. 22-25.)

Ms. Rives acknowledges that SSR 19-2p does not direct a specific manner in which the evidence must be evaluated, and fails to offer any specific explanation as to how the ALJ failed to comply with SSR 19-2p. This failure is particularly notable given that, Ms. Rives bears the burden of proof at Steps Three and Four, and "ha[s] the burden of showing specifically how [her] obesity, in combination with other impairments, limited [her] ability to a degree inconsistent with the ALJ's RFC determination." *Foss v. Comm'r of Soc. Sec.,* No. 1:16CV1907, 2017 WL 2912524, at *8 (N.D. Ohio June 20, 2017) (internal quotations and citation omitted), *report and recommendation adopted by* 2017 WL 2908857 (N.D. Ohio July 7, 2017); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments…").

The evidence of record includes: the opinion of consultative examiner Dr. Bradford, who recorded Ms. Rives' weight (205.25 pounds) and height (63 inches), and found no activity restrictions after an examination (Tr. 426-27); opinions of the state agency medical consultants who noted BMIs of 36.58 and 36.9 and concluded that there were no severe physical impairments (Tr. 120-21, 138-39); and evidence from the fraud investigation reflecting that Ms. Rives was observed to have a normal gait and ability to walk unassisted, bend at the waist, and get into a large SUV (Tr. 652-653). In light of this, the undersigned finds Ms. Rives has failed to demonstrate how the combination of her obesity with other impairments was inconsistent with the ALJ's findings at Step Three or Step Four. It is noted that the RFC in this case, while finding Ms. Rives could perform medium work, also made allowances for her physical impairments by limiting her to: occasional use of ramps and stairs but no use of ladders, ropes, or scaffolds;

frequent balancing, kneeling, stooping, crouching, and crawling; and restriction from heights and machinery.  (Tr. 21.)

In this case, the ALJ identified the severe impairments, explained that he had considered Ms. Rives' obesity in combination with her other impairments, adequately outlined the subjective complaints, objective findings, and medical opinion evidence, and formulated an RFC.  Ms. Rives has failed to demonstrate that the RFC does not sufficiently account for limitations caused by her obesity alone or in combination with her other impairments, and has not identified evidence that would necessitate a finding that the combination of her obesity and other impairments required further accommodation.

For all of the reasons set forth herein, the undersigned finds that Ms. Rives has not met her burden to demonstrate that the ALJ did not properly evaluate and accommodate her obesity under SSR 19-2p.

### 5.       Whether ALJ Erred in Consideration of Third-Party Source Statements

Ms. Rives also argues that the ALJ erred by failing to address or mention letters from third party sources, Mrs. Foster, her daughter, and Mr. Isom. (ECF Doc. 13 p. 20.)

Ms. Rives' argument is unsupported by the record and unavailing.  First, the ALJ did consider the statements provided by Mrs. Foster, her daughter, and Mr. Isom.  Specifically, the ALJ stated: "The undersigned reviewed and considered but is not required to analyze as medical opinions the statements of the claimant's daughter, boyfriend, and neighbor (Exhibits B17F through B19F)."  (Tr. 25.)  Second, the Regulations provide: "[SSA] [is] not required to articulate how [it] considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section."  20 C.F.R. § 404.1520c(d).  Thus, the ALJ was not required to analyze the third-party statements.  *See e.g., Hays v. Comm'r of Soc. Sec.,* No. 1:20-CV-02243,

2021 WL 5863976, at *5 (N.D. Ohio Dec. 10, 2021) ("The ALJ was not required to explain how

he considered Plaintiff's husband's report as it came from a non-medical source.").

Accordingly, the undersigned finds no merit to Ms. Rives' claim that the ALJ erred in his

evaluation of the evidence because he did not provide an analysis of the third-party statements.

### VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

February 4, 2022                          */s/ Amanda M. Knapp*
                                          AMANDA M. KNAPP
                                          UNITED STATES MAGISTRATE JUDGE

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may forfeit the right to appeal the District Court's order.  *See
Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140
(1985).

64